N7P3SHES

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          20 Cr. 412 (AT)

5    TIMOTHY SHEA,

6                   Defendant.

7    ------------------------------x    Sentencing

8                                       New York, N.Y.
                                        July 25, 2023
9                                       4:00 p.m.

10
     Before:
11
                        HON. ANALISA TORRES,
12
                                        District Judge
13

14                         APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     DEREK WIKSTROM
17   ROBERT SOBELMAN
          Assistant United States Attorneys
18
     THOMAS NOOTER
19        Attorney for Defendant

20

21

22

23

24

25

N7P3SHES

1        THE COURT:  Good afternoon.  We're here in the matter

2   of the United States v. Timothy Shea.

3        Would you make your appearances, pleases.

4        MR. WIKSTROM:  Yes.  Good afternoon.  Derek Wikstrom

5   and Rob Sobelman for the government.  And we're joined by Chris

6   de Grandpre and Andrea Gieseman, paralegals in our office.

7        MR. NOOTER:  Good afternoon.  Thomas Nooter for

8   Mr. Shea, who is standing next to me at counsel table.

9        THE COURT:  This matter is on for sentencing.  In

10  connection with today's proceeding, I've reviewed the

11  presentence investigation report for Mr. Shea dated

12  December 22, 2022, as revised on April 3, 2023, including the

13  recommendation and addendum; Mr. Shea's sentencing submissions

14  dated April 12 and 14th and June 10, 2023, including the

15  letters from Mr. Shea and his friends and family, and the

16  sealed submissions submitted this past weekend; and the

17  government's sentencing memo dated April 19, 2023, and the

18  consent order of restitution dated April 27, 2023.

19        Have the parties received all of the submissions?

20        MR. WIKSTROM:  Yes, your Honor.

21        MR. NOOTER:  Yes, your Honor.  I just note that the

22  sealed submission was submitted I think a little bit earlier.

23  Maybe the Court didn't receive it.  But the one concerning his

24  family member?

25        THE COURT:  Yes.  I am aware of that submission.

N7P3SHES

1          MR. NOOTER:  I wanted the government to be clear there

2    was nothing new that I had submitted.

3          THE COURT:  Anything further?

4          MR. WIKSTROM:  No, thank you, your Honor.

5          MR. NOOTER:  No, your Honor.

6          THE COURT:  Mr. Nooter, have you read the presentence

7    report?

8          MR. NOOTER:  Yes.

9          THE COURT:  Did you discuss it with your client?

10          MR. NOOTER:  I did.

11          THE COURT:  Mr. Shea, did you read the presentence

12    report?

13          THE DEFENDANT:  I did; yes, ma'am.

14          THE COURT:  You discussed it with Mr. Nooter?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Have you had the opportunity to go over

17    with him any possible errors in the report or anything else

18    that should be taken up with me?

19          THE DEFENDANT:  Yes, ma'am.  We've gone over it.

20          THE COURT:  Has the government, Mr. Wikstrom, have you

21    reviewed the presentence report?

22          MR. WIKSTROM:  Yes, your Honor.

23          THE COURT:  The Court has reviewed what Mr. Shea

24    describes as "the defense side of the allegations" set forth in

25    the presentence report.  Mr. Shea informs the Court about his

N7P3SHES

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | point of view, and challenges certain factual allegations in         |
| 2   | specific paragraphs.  The Court concludes that the narrative         |
| 3   | set forth in the report is consistent with the evidence adduced      |
| 4   | at trial, and to the extent that Mr. Shea is asking the Court        |
| 5   | to reject or modify the report, that request is denied.              |
| 6   | Does Mr. Shea have any further objections to the                     |
| 7   | report regarding factual accuracy?                                    |
| 8   | MR. NOOTER:  No, your Honor.  As your Honor mentioned,               |
| 9   | it had more to do with showing his state of mind and his point      |
| 10  | of view than contesting the actual facts.                            |
| 11  | THE COURT:  Does the government have any objections to              |
| 12  | the report concerning factual accuracy?                              |
| 13  | MR. WIKSTROM:  No, your Honor.                                       |
| 14  | THE COURT:  The Court adopts the factual recitations               |
| 15  | set forth in the report, and it will be made a part of the          |
| 16  | record in this matter and placed under seal.  If an appeal is        |
| 17  | taken, counsel on appeal may have access to the sealed report       |
| 18  | without further application to the court.                            |
| 19  | Although courts are no longer required to follow the                |
| 20  | sentencing guidelines, I'm still required to consider the           |
| 21  | applicable guidelines in imposing sentence.  To do so, it is        |
| 22  | necessary that I accurately calculate the sentencing range.         |
| 23  | With respect to Mr. Shea, the presentence report                    |
| 24  | calculates the offense level as 31 and the criminal history         |
| 25  | category as I, for a guidelines range of 108 to 135 months'         |

N7P3SHES

1    imprisonment.

2              Based on my independent evaluation of the guidelines,

3    I find that the offense level is 31, the criminal history

4    category is I, and the sentencing range is 108 to 135 months'

5    imprisonment.

6              Now I will hear from the parties.  Does the government

7    wish to be heard with regard to sentencing?

8              MR. WIKSTROM:  Yes, your Honor.  I'll start with a

9    housekeeping matter.  The government agrees with the Court's

10   and probation office's guidelines ranges.  But I do want to

11   note that there is a guidelines amendment that will take effect

12   in November -- the Court may be aware of this -- in which a new

13   section 4C1.1 will provide for a two-level downward adjustment

14   in the offense level for certain zero-point criminal history

15   offenders, of which Mr. Shea is one.

16             And so if Mr. Shea were being sentenced after November

17   of this year, that section 4C1.1 would call for a two-level

18   decrease.  It would bring the range in this case from 108 to

19   135 months' imprisonment to 87 to 108 months' imprisonment.

20   The government would respectfully ask that the Court account

21   for that in its considerations under Section 3553(a).

22             I'll note further, though, that the government's

23   recommendation of 63 months in this case wasn't really tied to

24   the guidelines.  We're recommending a pretty significant

25   downward variance, and our recommendation would not change even

1    with this adjusted guidelines range.

2         I am going to cover -- and I'll be brief because I

3    know the Court has sat through two trials in this case and has

4    sentenced two co-defendants, so the Court is quite familiar

5    with the facts here, so I won't belabor what the Court already

6    knows from prior proceedings or from our written submission.

7    But I want to talk briefly about the seriousness of this crime,

8    about Mr. Shea's role in it and his relative culpability, and

9    finally about acceptance of responsibility.

10        I'll start by saying, in short, Mr. Shea and his

11   co-defendants raised millions of dollars through lies in a

12   scheme that from the very beginning was a grift.  This crime is

13   undoubtedly worse because they were stealing from people who

14   believed in and who were donating money to a political cause.

15        And as we emphasized at both of the trials in this

16   case, this case is not about and has never been about whether

17   it's a good idea to build a wall on the southern border.  The

18   political valence of the issue for which they were raising

19   money is utterly irrelevant.  But it is particularly

20   blameworthy, and it is particularly immoral to steal from

21   people, to take advantage of people for their genuinely held

22   political beliefs, no matter what we think of those beliefs.

23        And as the Court said in sentencing Mr. Badolato and

24   Mr. Kolfage, this crime didn't just victimize the hundreds of

25   thousands of donors.  It victimized everybody.  It victimized

society.  This is a crime that harms our democracy.

Now, as we've said in our submission, and as
Mr. Nooter pointed out in his supplemental submission, everyone
agrees that Mr. Shea as a matter of just focusing on the
offense conduct itself, and not the personal history or
characteristics or the other sentencing factors, Mr. Shea is
less culpable than were Mr. Kolfage or Mr. Badolato.  And for
that reason, we've recommended a pretty significant downward
variance.  But it shouldn't detract from the seriousness of
Mr. Shea's own conduct.

He, with Mr. Kolfage, started this entire scheme.  He
was there from the very beginning.  He was involved in
formulating the scheme.  He came up with it.  He was, as it was
carried out, an integral part of the scheme.  He was one of the
principal conduits for embezzling money.  He was one of the
principal participants in the laundering of that money.  And in
carrying out the schemes, Mr. Shea actively participated in the
coconspirators' efforts to hide the scheme from law
enforcement, both by papering various embezzlement transactions
and conduct in which Mr. Shea was at the forefront, and in
creating the phony documents that led to the obstruction
conviction in this case.  A conviction, by the way, for which
Mr. Shea still denies responsibility.

In addition, as we noted in our submission, both
Mr. Kolfage and Mr. Badolato presented some significant

N7P3SHES

1    personal characteristics that were mitigating that are not

2    present in this case.  One major distinguishing factor between

3    Mr. Shea on the one hand, and Mr. Kolfage and Badolato on the

4    other, is acceptance of responsibility.  And the Court in

5    adopting the guidelines calculation has adopted a calculation

6    that already doesn't credit Mr. Shea for acceptance.

7            I want to emphasize on the facts, that's completely

8    appropriate.  It is not just because Mr. Shea went to trial.

9    It's because of the way in which he went to trial.  He says now

10   that he was simply going to trial to assert a venue defense,

11   but your Honor sat through both of these trials, and Mr. Shea's

12   defense was not principally about the venue.  In fact, I recall

13   in the second trial repeated arguments that Mr. Shea hadn't

14   done anything wrong because he was doing actual work, and

15   because they were actually building segments of wall.  As if

16   it's okay to steal money from victims, as long as some of it is

17   going towards what you promised them it would.

18           But even in his own sentencing submissions in which

19   Mr. Shea was trying to convince the Court to give him the

20   benefit of a reduction for acceptance of responsibility, he

21   continued to minimize his own conduct.  He calls his wrongdoing

22   "things that I later realized I should not have done."  That

23   wouldn't be sufficient as an allocution.  That's not true

24   acceptance.

25           He persists in his letter in his claim that he started

N7P3SHES

| | |
|---|---|
| 1 | this with good intentions.  That claim is flatly belied by the |
| 2 | text messages in this case in which Mr. Shea and Mr. Kolfage |
| 3 | cooked up this scheme and laughed about it, and thought |
| 4 | immediately about ways they could further monetize it, to put |
| 5 | money in their own pockets. |
| 6 | And finally, Mr. Shea claims to "now see that he |
| 7 | misinterpreted the importance of the false statements that they |
| 8 | used to steal money from donors." As if it dawned on him at |
| 9 | some later time.  But the Court will remember evidence at trial |
| 10 | in which there was a banner at the top of a merchandise store |
| 11 | that Mr. Shea and his co-conspirators were running that said |
| 12 | money from the merchandise sales would be spent on the wall. |
| 13 | And that was false.  They were selling merchandise and |
| 14 | pocketing all that money.  Mr. Shea asked about that.  He said, |
| 15 | are we sure that's okay?  And he was told, oh, it's fine, it |
| 16 | can't be proven.  And he said, oh, okay.  I just don't want to |
| 17 | go to jail. |
| 18 | He now treats that as if he was some kind of |
| 19 | whistleblower.  It is just flatly inconsistent with the |
| 20 | documentary evidence in this case. |
| 21 | And I'll note also, as I said, Mr. Shea persists in |
| 22 | claiming that the obstructive conduct that he engaged in, the |
| 23 | papering of phony transactions to buy an e-mail list and to |
| 24 | provide services to We Build the Wall, these post hoc |
| 25 | justifications for six-figure embezzlement, he continues to |

1    claim those were innocent and legitimate.

2            Here's why that matters.  None of this is to say that

3    the Court should penalize Mr. Shea for exercising his right to

4    go to trial.  That of course is not what anyone is advocating

5    for, and it is not, I know, what the Court is going to do.  But

6    Mr. Shea's unwillingness even now to fully grapple with the

7    gravity, the seriousness of his conduct, it is a red flag

8    that's relevant to a number of purposes of sentencing that the

9    Court is required under Section 3553(a) to consider.  It is

10   relevant to the need to promote respect for the law, it is

11   relevant to the need for specific deterrence, and it's relevant

12   to the need to protect the public.  Because actual, genuine,

13   timely acceptance of responsibility and genuine remorse are

14   rightly treated by courts as indicators that a person is less

15   likely to recidivate, that there is less of a need for specific

16   deterrence, that there is less of a need to protect the public

17   going forward.

18           On the other side of the coin, when people fail to

19   accept responsibility or when at the last minute they feign

20   acceptance to try to get leniency from a Court after having

21   been convicted, it is reasonable for the Court to be concerned,

22   particularly concerned about the purposes of sentencing that

23   focus on whether the defendant is at risk of doing something

24   like this again.

25           So, for all of those reasons, and for the reasons in

N7P3SHES

1    our written submission, the government respectfully requests

2    that the Court sentence Mr. Shea to 63 months' imprisonment.

3             Thank you, your Honor.

4             THE COURT:  Mr. Nooter.

5             MR. NOOTER:  Thank you, your Honor.

6             First of all, I'd just like to say I believe I did

7    address pretty much all of those points in my submissions.  So

8    I don't want to go through them in detail.

9             The two main things that I would like to emphasize

10   right now, though, are that everything about Mr. Shea's

11   background, and the evidence we have of his character, shows

12   that he is a very fine person.  He's very religious, he's very

13   generous, he volunteers a good deal of his time to his church

14   and his community.  There is not a hint that any time before

15   this We Build the Wall thing came up, that he had ever engaged

16   in any kind of fraudulent activity, tax evasion, or anything

17   else.

18            And that to me makes him stand out from his

19   co-defendants in this case in a way that wasn't particularly

20   brought out in a lot of detail.  I don't really want to

21   badmouth other people.  But it was clear that, for example,

22   Mr. Kolfage had another set of indictments from Florida

23   involving tax fraud, that there was evidence that he had done

24   other things in the past that were questionable.  And it

25   seems -- it's less clear to me what it is, but it seems to me

N7P3SHES

Mr. Badolato had some kind of past that was mostly blanked out in the documents, so I don't know the details of that.

Mr. Shea, on the other hand, is a genuinely decent, good person with family responsibilities that he takes enormously seriously, and has a family that is enormously dependent on him. His children are 16 and 17. He has twins who are 16, and are very dependent at that age before they can drive, at least by themselves, on his being able to take them to and from games and school events and things like that. He has a wife who has problems of her own, which, again, I won't go into detail about, but I've submitted under seal some information about that. And that will make it difficult if Mr. Shea is away at jail, for her to be able to take care of the children in the way they need to be taken care of, and for Mr. Shea to take care of her in the way that she needs to be taken care of.

Obviously, when a person commits a crime, it redounds against innocent family members and others. But at the same time, I think it is an important consideration not at least dissimilar to the health considerations that the other two defendants had. Because of the dependency of those people on him, and because of the very strong evidence that he is that dependable person, that he is a person who is there for the family members. I particularly note in my Exhibits D and E the Phipps family where, when his -- I guess it is his

N7P3SHES

1    sister-in-law passed away fairly young, he kind of took over

2    being the father of that family.  And the incredible gratitude

3    that those people feel for the way he treated them, the way he

4    brought them up, for the kind of role model he's been.

5         So, in this case, and again, one of the huge problems

6    in the case as far as my client accepting responsibility or

7    pleading guilty, I mean, I frankly wish I had been in this case

8    from the very beginning.  I think it would have been handled

9    differently.  I'm not quite sure why a gentleman was on the CJA

10   panel and would be assigned to someone like Mr. Shea who is

11   kind of known for having a radical approach to criminal

12   defense.  But I don't think it was right for Mr. Shea.

13        But, be that as it may, he did make a point of saying

14   they tried to work out plea agreements before both trials.  It

15   was unclear to him why the plea offers were as high as they

16   were that being discussed, not necessarily formally proffered,

17   but discussed.  And that that's why they ended up going to

18   trial.

19        And despite whatever his defense lawyer may have said,

20   Mr. Shea himself did not take the witness stand and try to say

21   anything that would be misleading to the jury.  He did not ask

22   to have any witnesses called who might say anything that was

23   misleading to the jury.  And Mr. Meringolo himself focused

24   primarily on the lack of proof beyond a reasonable doubt, which

25   is a perfectly appropriate way to defend a case, even if your

1  client is guilty, to say that proof beyond a reasonable doubt

2  is what the government should have to present.

3         The other thing I guess I would just like to focus on

4  a little bit is what I did discuss, so I'll only do a little

5  bit.  How does a man as good and decent as Mr. Shea end up in

6  this situation.  And when the government keeps harping on the

7  idea that he was in on this fraud from the very beginning, it

8  almost belies a little bit another statement in their

9  presentence submission in which they said that Mr. Badolato was

10  the one who convinced Mr. Kolfage to actually put the promise,

11  the banner that he wouldn't take any money for this into the

12  promotional materials for all of this.

13         And the reality is that, again, some of what's in

14  those texts is being analyzed a certain way that we don't fully

15  agree with.  And one of the I think indicators is the fact that

16  right in that first set of texts about the idea of raising

17  money for the wall, that Mr. Shea's contribution to that was,

18  well, I have this energy drink company.  We could make a profit

19  that way.  The government seems to continue to want to say that

20  the side businesses were somehow fraudulent.

21         They would have been fraudulent if they were

22  expressing the same fraudulent promise that Mr. Kolfage or

23  other people working on it weren't receiving any money for it.

24  But the one indicator that that might have happened, I believe

25  I showed pretty convincingly, was not ever actually shown to

1    people who were purchasing the products.  It was an idea that

2    someone threw out -- I claim it was not Mr. Shea -- but whoever

3    threw it out, Mr. Shea questioned it, and it did not appear on

4    the website for selling those things.

5              What was used as an exhibit in the trial was a

6    screenshot that Mr. Shea took of it when that website was in

7    development.  And which he sent with his question do we really

8    want to put this on here.  So again, there is a big problem

9    with some of the interpretation of these things.

10             But, what I submit is that Mr. Shea did want to make

11   money on this project right from the beginning.  He wasn't

12   doing it because he has strongly held political beliefs.  He

13   was doing it as a business opportunity.  The way someone now

14   might want to promote products for the Barbie doll or something

15   like that.  An opportunity is there, there is a lot of public

16   interest.  It's a way to not steal their money, but to sell

17   things and make money.

18             He also, as I think is clear, did more than anybody in

19   this crowd to actually build the wall, the 3 miles or so of

20   wall that was built.

21             So, I've tried to communicate and Mr. Shea has tried

22   to communicate through his letter to the Court that he is not

23   trying to say he was an angel in this.  But, I don't think he

24   was as guilty of some of those things as has been suggested by

25   the government's just reading from the outside of text messages

N7P3SHES

1    and other communications.  And I think that this did devolve

2    more into something that got out of control, and that he

3    started to really lose his judgment about.

4         And we've never totally denied that he obstructed

5    justice.  He admits that it was a total mistake to backdate

6    contracts or to put memos for services that were not really for

7    the services rendered.  So, yes, he has not accepted

8    responsibility to the satisfaction of the government.  And I

9    don't think it ever probably would have happened, because the

10   truth from Mr. Shea's point of view is that it wasn't the way

11   the government said, even though he admits that he was guilty

12   of a good deal of conduct that he should not have done.

13        So given those things, and what I'm asking the Court

14   is to take very substantial consideration of the man he is,

15   other than what he did in this case.  The man he is to his

16   family, and the dependency that the family has on him, and the

17   fact that, even though the idea of specific and general

18   deterrence is something that tends to militate toward sending a

19   person to jail, this is not a man who has any chance of being a

20   recidivist in this kind of thing.  It just is just not there.

21   There is nothing about the way he's been all his life, that now

22   that he's facing the consequences of what he did, that he would

23   ever go back and risk his relationship with his family, his

24   duties to his family, to do anything of this kind again.

25        And again, it just, it still astounds me that the

N7P3SHES

1    government is asking for more time than they asked for for the

2    co-defendants.  Claiming, for example, acceptance of

3    responsibility, when they spent 16 pages of their report

4    showing how Mr. Kolfage did not accept responsibility.  And how

5    other things about, for example, the plea offers that were made

6    to the co-defendants, that did not have an obstruction of

7    justice element in it because they said they didn't realize it

8    at the time those plea offers were extended.  Now Mr. Shea has

9    that, that's driven the guidelines up.

10           It still astounds me that a person who is the least

11   culpable in this case, should be -- they should recommend he

12   gets more time than the person who is clearly the -- at least

13   the most culpable who actually had to face a sentence.

14           Thank you, your Honor.

15           THE COURT:  Mr. Shea, would you like to say something?

16           THE DEFENDANT:  Yes, ma'am.  Thank you for hearing me,

17   ma'am.

18           Ma'am, I do want to tell you that I do regret what has

19   happened here with the We Build the Wall, and I wish I was

20   never involved with any of that.

21           And I don't want to waste your time and go through all

22   the stuff that we've already written you, but I do want to

23   reiterate that my family plays a huge role in my life, and I

24   play a huge role in their life.  And my daughters are 14, not

25   quite 16, but getting there.  And my son is 17.  This is his

N7P3SHES

1    final year of school, and they're just starting high school.

2    And my wife is in a place where she needs support to not -- to

3    not slip back into things that have happened in the past.

4            And I am just asking for leniency today, ma'am, that I

5    could be not necessarily seen as how the government is

6    portraying me.  It's very different than the person that I am.

7            And again, I regret all of the We Build the Wall

8    stuff.  But I pray, I pray -- I ask that you would be lenient

9    and consider the kids.  Thank you.

10           THE COURT:  Is there any reason why sentence should

11   not be imposed at this time?

12           MR. WIKSTROM:  No, your Honor.

13           MR. NOOTER:  No, your Honor.

14           THE COURT:  As I have stated, the guidelines range to

15   be used in this case is 108 to 135 months' imprisonment.

16   However, I want to make clear that I have considered the

17   upcoming amendment which reduces the guidelines range to 87 to

18   108 months' imprisonment.  That of course is not yet in effect,

19   but it is something that I have considered.

20           Under the Supreme Court's decision in *Booker* and its

21   progeny, the guidelines range is only one factor that I must

22   consider in deciding the appropriate sentence.  I'm also

23   required to consider the other factors set forth in 18, United

24   States Code, Section 3553(a).  These include:

25           First, the nature and circumstances of the offense and

1    the history and characteristics of the defendant;

2           Second, the need for the sentence imposed to reflect

3    the seriousness of the offense, to promote respect for the law,

4    and to provide just punishment for the offense; to afford

5    adequate deterrence to criminal conduct; to protect the public

6    from further crimes of the defendant; and to provide the

7    defendant with needed educational or vocational training,

8    medical care, or other correctional treatment in the most

9    effective manner;

10          Third, the kinds of sentences available;

11          Fourth, the guidelines range;

12          Fifth, any pertinent policy statements;

13          Sixth, the need to avoid unwarranted sentence

14   disparities among defendants with similar records who have been

15   found guilty of similar conduct; and

16          Seventh, the need to provide restitution to any

17   victims of the offense.

18          Ultimately, I am required to impose a sentence

19   sufficient, but not greater than necessary, to comply with the

20   purposes of sentencing that I mentioned a moment ago.

21          I've given substantial thought and attention to the

22   appropriate sentence in light of the Section 3553(a) factors

23   and the purposes of sentencing as reflected in the statute.

24          On the one hand, Mr. Shea committed a serious offense.

25   In December 2018, through a crowdfunding website known as

1    GoFundMe, Mr. Shea, along with his co-defendant Brian Kolfage,

2    initiated an online fundraising campaign that generated more

3    than $20 million.  According to web page statements, the

4    campaign planned to donate the money to the federal government

5    for the construction of a wall along the southern border of the

6    United States.  Within a month, after questions arose

7    concerning Mr. Kolfage's background and the campaign's stated

8    purpose, GoFundMe suspended the campaign, warning that unless

9    defendants identified a legitimate nonprofit organization into

10   which those funds could be transferred, the crowdfunding

11   website would return the funds.

12        Mr. Kolfage then enlisted others to establish a

13   nonprofit entity called We Build the Wall, to receive the money

14   contributed to the online campaign in order to fund the private

15   construction of the wall.  Mr. Kolfage and others made a series

16   of representations and assurances to GoFundMe, including their

17   commitment to put into place written bylaws and a promise that

18   Mr. Kolfage would not be compensated from donor funds.

19   Starting in January 2019, in donor solicitations, public

20   statements, social media posts, and press appearances, they

21   promised donors that 100 percent of funds raised would be used

22   toward the construction of a wall, and that not a penny would

23   be used to compensate Mr. Kolfage.  They also said that the

24   leadership of We Build the Wall and its advisory board would

25   not be compensated.  Mr. Shea was familiar with his

1  co-defendants' promises and representations, and knew that they

2  were false.

3       Mr. Shea then assisted his co-defendants in secretly

4  passing the We Build the Wall payments back to themselves

5  through the use of shell companies.  Mr. Shea kicked back a

6  quarter of a million dollars to Mr. Kolfage, and kept more than

7  $180,000 for himself, which he spent on his personal

8  businesses.

9       Then, in October 2019, when the defendants learned of

10  a possible criminal investigation, Mr. Shea and his

11  co-defendants took additional steps to conceal their scheme,

12  including ceasing payments, using encrypted messaging

13  applications, and editing We Build the Wall's website to remove

14  the promise that Mr. Kolfage was not being compensated.

15       I am not going to go over all of what I said during

16  the sentencing of Mr. Kolfage and Mr. Badolato, but I do

17  believe that certain things bear repeating.

18       Last October, two individuals, Bill Ward and Nicole

19  Keller, both victims of the fraudulent scheme, testified at

20  trial.

21       Mr. Ward, a retiree from Gold Canyon, Arizona, who

22  served 21 years in the Army, took the stand and stated that he

23  had donated $100 to We Build the Wall because he believes that

24  Congress has failed to address the immigration problem at the

25  southern border.  Mr. Ward said, "I just felt I'd been

N7P3SHES

1    cheated."

2           Ms. Keller, a tenth grade biology teacher from

3    Lancaster County, Pennsylvania, testified that she contributed

4    between 50 and $100 because her late husband was a border

5    patrol agent, and border security was an issue of great concern

6    to him.  She feels the same way.  Ms. Keller said, "I was

7    insulted that somebody had taken what should be a position of

8    honor and valor, being injured for their country, and instead

9    used it to defraud me."

10          When Mr. Ward and Ms. Keller donated their money to

11   Build the Wall, they were expressing their views about a

12   political issue that was important to them -- immigration.

13   When Mr. Shea and his co-defendants took Mr. Ward's and

14   Ms. Keller's money under false pretenses, the perpetrators of

15   this fraud not only cheated these individual donors, they hurt

16   us all by eroding the public's faith in the political process.

17          On the other hand, there are mitigating factors that

18   weigh in Mr. Shea's favor.  Mr. Shea is 52 years old and has no

19   criminal history.

20          He maintains the strong support of his friends and

21   family.  Katelyn Phipps, Mr. Shea's sister-in-law, writes that

22   he was a role model to her because of his strong, stable, and

23   dedicated nature.  Michael Shea, Mr. Shea's brother, states

24   that he has always been very loving and caring.  One of

25   Mr. Shea's daughters writes that he has love and compassion

N7P3SHES

1    built into his soul.  His other daughter says he was always

2    there for her, even during the worst periods of her life.

3    Phyllis Shea, Mr. Shea's mother, writes he is a devoted and

4    loving family man.  The remaining letters to the Court convey a

5    similar sentiment.

6            Mr. Shea has taken responsibility for his actions to a

7    certain degree, and has also expressed regret for his behavior

8    as reflected by his sentencing submission and his statements

9    today.

10            I've also considered the sentences of Mr. Shea's

11    co-defendants.  The Court previously sentenced Mr. Kolfage to

12    51 months' imprisonment, and Mr. Badolato to 36 months'

13    imprisonment.  However, both Mr. Kolfage and Mr. Badolato had

14    severe medical conditions which were extremely strong

15    mitigating factors during their sentencings.

16            Lastly, the Court has assessed the role that Mr. Shea

17    played in the overall scheme.  The government states that

18    Mr. Shea certainly was less critical to the scheme than either

19    Mr. Badolato or Mr. Kolfage.

20            If there ever is a day in a person's life when he is

21    entitled to be judged on the basis of the entirety of his

22    background and contributions, it is at sentencing.  And Section

23    3553(a), in directing the Court to consider the history and

24    characteristics of the offender, is consistent with that.  The

25    sentence I will impose today will credit Mr. Shea for his good

N7P3SHES

1    qualities and recognize the seriousness of his crimes.

2             I conclude, therefore, for all of the reasons stated,

3    that a sentence below the guidelines range is merited for

4    Mr. Shea.  Accordingly, I do believe a variance pursuant to 18,

5    United States Code, Section 3553(a) is warranted for Mr. Shea.

6             Mr. Shea, I will now impose your sentence.  You may

7    stand.

8             Mr. Shea, it is the judgment of this Court that you

9    are sentenced to 63 months' imprisonment for each count to run

10   concurrently, and to be followed by three years of supervised

11   release.

12            There will be no fine because probation reports that

13   you are not able to pay a fine, although you must pay the

14   mandatory $300 special assessment, which is due immediately.

15            The mandatory and standard conditions of supervised

16   release set forth on pages 34 and 35 of the presentence report

17   shall apply.

18            In addition, the following special conditions shall

19   apply:

20            You must provide the probation officer with access to

21   any requested financial information.

22            You must not incur new credit charges or open

23   additional lines of credit without the approval of the

24   probation officer, unless you are in compliance with the

25   installment payment schedule.

N7P3SHES

1            You shall submit your person, and any property,

2   residence, vehicle, papers, computer, other electronic

3   communication, data storage devices, cloud storage or media and

4   effects to a search by any United States probation officer,

5   and, if needed, with the assistance of law enforcement.  The

6   search is to be conducted when there is reasonable suspicion

7   concerning violation of a condition of supervision or unlawful

8   conduct by the person being supervised.  Failure to submit to a

9   search may be grounds for revocation of release.  You shall

10  warn any other occupants that the premises may be subject to

11  search pursuant to this condition.  Any search shall be

12  conducted at a reasonable time and in a reasonable manner.

13           If the probation officer determines, based on your

14  criminal record, personal history or characteristics, that you

15  pose a risk to another person, including an organization, the

16  probation officer, with the prior approval of the court, may

17  require you to notify the person or organization about the

18  risk, and you must comply with that instruction.  The probation

19  officer may contact the person or organization, and confirm

20  that you have notified the person or organization about the

21  risk.

22           It is recommended that you be supervised in the

23  district of your residence.

24           Mr. Shea, you are jointly and severally responsible

25  for paying restitution in the amount of $25,601,615, of which

N7P3SHES

you have been apportioned liability for a $1,801,707.  These

payments are payable to the victims specified by the government

in accordance with the terms outlined in the restitution order,

which includes that:

      Upon your release from prison, you shall commence

monthly installment payments in an amount equal to 15 percent

of your gross income payable on the first of each month.

      You must notify the clerk of court, the probation

officer, and the United States attorney for this district

within 30 days of any change of mailing or residence address

that occurs, or any material change in your financial resources

that affects your ability to pay restitution while any portion

of the restitution remains unpaid.

      Finally, I'm required to remind you that as a result

of committing the offense alleged in Count One of the

superseding indictment, you shall forfeit to the United States

pursuant to 18, United States Code, Section 981(a)(1)(C), 21,

United States Code, Section 853, and 28, United States Code,

Section 2461(c), any and all property constituting or derived

from any proceeds you obtained, directly or indirectly, as a

result of the violation, and any and all property used or

intended to be used in any manner or part to commit and to

facilitate the commission of the offense alleged in Count One

of the superseding indictment.  Mr. Shea, specifically, that is

a sum of $1,801,707.

N7P3SHES

1          Does counsel for the government or for the defendant

2     know of any legal reason why the sentence should not be imposed

3     as stated?

4          MR. WIKSTROM:  No, your Honor.

5          MR. NOOTER:  No, your Honor.

6          THE COURT:  The sentence as stated is imposed.  That

7     is the sentence of the Court.

8          You have a right to appeal your conviction and

9     sentence.  The notice of appeal must be filed within 14 days of

10    the judgment of conviction.  If you are not able to pay the

11    costs of an appeal, you may apply for leave to appeal in forma

12    pauperis.  If you request, the clerk of court will prepare and

13    file a notice of appeal on your behalf.

14         I understand that the probation department recommends

15    voluntary surrender.  Have the parties agreed to a surrender

16    date?

17         MR. NOOTER:  We did not discuss it, but I would ask

18    for maybe 90 days, something like that, so that a facility can

19    be designated and he can surrender directly to it.

20         MR. WIKSTROM:  I understand the current standard is 45

21    days, but no objection to 90.

22         THE COURT:  The surrender date is Monday, October 23.

23    Are there any further applications?

24         MR. WIKSTROM:  There are, your Honor.  There are

25    underlying indictments, and the government moves to dismiss

N7P3SHES

1    them.

2              THE COURT:  I dismiss the underlying indictments.

3              MR. NOOTER:  Your Honor, I would ask for a

4    recommendation to the Bureau of Prisons for FCI Englewood in

5    Colorado.  That's closest to where his family lives.

6              THE COURT:  I will make that recommendation.

7              All righty, Mr. Shea, I wish you good luck.

8              THE DEFENDANT:  Thank you, ma'am.

9              THE COURT:  The matter is adjourned.

10             MR. WIKSTROM:  Thank you, your Honor.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25